**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF NEW YORK *ex rel.* Fraud Buster, LLC,<br><br>        Plaintiffs,<br><br>    vs.<br><br>ENZO BIOCHEM, INC., a New York corporation, ENZO CLINICAL LABS, INC., a New York corporation, ENZO LIFE SCIENCES, INC., a New York corporation,<br><br>        Defendants. | CASE NO. 1:22-cv-07613<br><br>FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS OF THE FALSE CLAIMS ACT<br><br>DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**

Page(s)

I.      INTRODUCTION ................................................................................................... 1

II.     JURISDICTION AND VENUE .......................................................................... 2

III.    PARTIES ................................................................................................................ 3

IV.     STATUTORY AND REGULATORY BACKGROUND .................................... 6

    A.    Relator's Causes of Action ........................................................................ 6

        i.    Federal False Claims Act, 31 U.S.C. § 3729, *et seq.* .................................... 6

        ii.   New York False Claims Act, N.Y. State Fin. Law § 187, *et seq.* ................... 7

        iii.  Federal and New York Anti-Kickback Statutes ............................................. 7

    B.    Regulatory Framework for Enzo's Laboratory Services ....................................... 8

        i.    The Medicare and Medicaid Programs ............................................................ 8

        ii.   Diagnosis Codes and Medical Necessity ......................................................... 9

        iii.  Prohibition on Waiving or Limiting Patient Obligations.............................. 9

        iv.   Laws and Regulations During the Covid-19 Public Health Emergency....... 14

V.      ENZO KNOWINGLY VIOLATED THE FEDERAL AND NEW YORK FALSE
        CLAIMS ACTS ............................................................................................... 15

    A.    Enzo Used the Wrong Diagnosis Code to Ensure Reimbursement for
              Asymptomatic Covid-19 Surveillance Testing...................................................... 15

    B.    Enzo Waived Patient Obligations as a Kickback to Induce the Referral of
              Business .................................................................................................................. 20

    C.    Enzo Used the Code for Covid-19 Rapid Testing Even When Rapid Testing Was
              Not Performed........................................................................................................ 26

VI.     CAUSES OF ACTION ...................................................................................... 27

    FIRST CAUSE OF ACTION
        On Behalf of the United States
        Federal False Claims Act, Presenting False Claims
        31 U.S.C. § 3729(a)(1)(A)
        (Against All Defendants) .......................................................................................... 27

i

SECOND CAUSE OF ACTION
On Behalf of the United States
Federal False Claims Act, Making or Using False Records or Statements Material
to Payment or Approval of False Claims
31 U.S.C. § 3729(a)(1)(B)
(Against All Defendants) ....................................................................................... 28

THIRD CAUSE OF ACTION
On Behalf of the United States
Retention of Proceeds to Which Not Entitled
31 U.S.C. § 3729(a)(1)(G)
(Against All Defendants) ....................................................................................... 29

FOURTH CAUSE OF ACTION
On Behalf of the State of New York
False Claims Act, Presenting False Claims
New York State Finance Law § 189(1)(a)
(Against All Defendants) ....................................................................................... 30

FIFTH CAUSE OF ACTION
On Behalf of the State of New York
False Claims Act, Making or Using False Records or Statements
New York State Finance Law § 189(1)(b)
(Against All Defendants) ....................................................................................... 31

SIXTH CAUSE OF ACTION
On Behalf of the State of New York
False Claims Act, Retention of Proceeds to Which Not Entitled
New York State Finance Law § 189(1)(h)
(Against All Defendants) ....................................................................................... 32

VII.    PRAYER FOR RELIEF ................................................................................................... 33

VIII.    DEMAND FOR JURY TRIAL ....................................................................................... 35

Plaintiffs United States of America ("United States") and the State of New York ("New York"), by and through Relator Fraud Buster, LLC, allege as follows:[1]

## I.      INTRODUCTION

1.      Over the course of several years, Enzo Biochem, Inc., Enzo Clinical Labs, Inc., and Enzo Life Sciences, Inc. (collectively, "Enzo") defrauded state and U.S. taxpayers through three independent schemes designed to defraud Medicare, Medicaid, and other government payors.

2.      **Scheme 1.** Enzo used the wrong diagnostic code, Z03.818, to trigger payments for COVID-19 surveillance tests.  In using code Z03.818, Enzo falsely represented, for each patient receiving a surveillance test, that "there is a concern about a possible exposure to COVID-19, but this is ruled out after evaluation."  Enzo did not perform any evaluation that would warrant use of the code.

3.      **Scheme 2.** Enzo reduced private patients' co-payment and deductible obligations in return for payments from government insured patients in violation of the Anti-Kickback Statute. *See* HHS-OIG Advisory Opinion 15-04 at 6 (by waiving or discounting copayments and deductibles, laboratories would be "offer[ing] physician practices a means to work solely with the [laboratory], reducing administrative and possibly financial burdens associated with using multiple laboratories," which may amount to "remuneration").[2]  Enzo's lowering of co-payments and deductibles not only allowed Enzo to keep patients enrolled in Emblem-GHI, an insurance company

---

[1] The original complaint in this action alleged claims on behalf of the State of Connecticut under the Connecticut False Claims Act, Conn. Gen. Stat. § 4-274, *et seq.*  On August 15, 2024, the State of Connecticut intervened in this action to settle claims against Enzo Biochem, Inc. and Enzo Clinical Labs, Inc. for overbilling Connecticut's Medicaid program.  *See* https://portal.ct.gov/ag/press-releases/2024-press-releases/attorney-general-tong-announces-false-claims-settlement-with-enzo-clinical-labs.

[2] U.S. Dep't Health & Hum. Servs., OIG, Advisory Opinion 15-04 (2015), https://oig.hhs.gov/documents/advisory-opinions/693/AO-15-04.pdf [**Exhibit 1**].

with 3.4 million members in the New York Metropolitan area; it also allowed Enzo to keep a physician's government-insured patients—lucrative "pull-through" Medicare, Medicaid, and other government insurance revenue.  Enzo's lowering or waiver of Emblem-GHI patient copayments and deductibles further allowed Enzo to onboard new physicians and other clients. This resulted in diminished restraints on whether tests were medically necessary, as costs are substantially reduced for patients due to the waivers.

4.     **Scheme 3.** Enzo used the code for expedited COVID-19 tests, U0005, even though Enzo failed to complete the tests within the required two calendar days.[3]

5.     This is a *qui tam* action for violation of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the New York False Claims Act, N.Y. State Fin. Law § 187, *et seq.*, brought by Relator on behalf of the United States and the State of New York for fraudulent billing of government insurers.

## II.     **JURISDICTION AND VENUE**

6.     This Court has jurisdiction under 31 U.S.C. § 3730(b), which confers jurisdiction on this Court for actions brought under the federal False Claims Act. This Court additionally has subject matter jurisdiction over the federal FCA claims (First through Third Causes of Action) under 28 U.S.C. § 1331.

7.     This Court has subject matter jurisdiction over the New York False Claims Act claims (Fourth through Sixth Causes of Action) under 28 U.S.C. § 1367, as the state claims are so related to the federal FCA claims that they form part of the same case or controversy.

8.     Venue is proper in this district under 31 U.S.C. § 3732(a), which authorizes

---

[3] U.S. Ctr. Medicare & Medicaid Srvs., CMS Rulings (Jan. 1, 2021) at 6-7, https://www.cms.gov/files/document/cms-ruling-2020-1-r2.pdf [**Exhibit 2**].

nationwide service of process, and 28 U.S.C. § 1391(b)-(c) because Defendants can be found in, reside in, or transact business in the Southern District of New York, and many of the alleged acts occurred in this district.

### III.    **PARTIES**

9.    Plaintiffs in this action are the United States of America and the State of New York by and through Relator Fraud Buster, LLC.

10.    Relator Fraud Buster, LLC is a Delaware limited liability company whose members were former Enzo employees or involved in the healthcare industry.  Member 1 is a former Enzo Vice President of Sales & Marketing. Member 2 is a former Enzo Field Service Manager. Member 3 is a health industry veteran who has had a long career in the commercial reference laboratory business. Non-public information personally known to Relator and its members serves as the basis for this action.

11.    Defendant Enzo Biochem, Inc. ("Enzo Biochem") is a New York corporation with its principal place of business in Farmingdale, New York.

12.    Defendant Enzo Clinical Labs, Inc. ("Enzo Clinical Labs") was, at times relevant to the allegations in this Complaint, a New York corporation with its principal place of business in Farmingdale, New York and a wholly owned subsidiary of Enzo Biochem.  Enzo Clinical Labs operated a clinical laboratory providing services to physicians, other healthcare practitioners, and patients in states including New York.

13.    Defendant Enzo Life Sciences, Inc. ("Enzo Life Sciences") is a New York corporation with its principal place of business in Farmingdale, New York and a wholly owned subsidiary of Enzo Biochem.

14.    Enzo Biochem sold Enzo Clinical Labs to Laboratory Corporation of America

Holdings pursuant to an asset purchase agreement dated March 16, 2023, as amended July 3, 2023. Under the terms of the 2023 asset sale of Enzo Clinical Labs, Enzo Biochem retained "any Liability arising out of Seller's or Seller Parent's obligations under or agreements with any Governmental Programs (including pursuant to any Provider Agreements) arising from the operation of the Business on or prior to the Closing Date."[4]

15.      As detailed below, Enzo Clinical Labs and Enzo Life Sciences are each alter egos of Enzo Biochem and one another.  Enzo Biochem exerted dominion and control over each of Enzo Clinical Labs and Enzo Life Sciences.  There was at all relevant times such a unity of interest and ownership among each of Enzo Biochem, Enzo Clinical Labs, and Enzo Life Sciences that the separate personalities of these entities did not exist and the entities operated as a single economic entity.  If the acts of each of these entities were treated as those of the individual corporation alone, an inequitable, unjust, and unfair result would follow.

16.      At all times relevant to this Complaint, Enzo Clinical Labs and Enzo Life Sciences operated as wholly owned subsidiaries of Enzo Biochem.

17.      Enzo Biochem maintained a board of directors, while its subsidiaries, Enzo Clinical Labs and Enzo Life Sciences, did not. At all times relevant to this Complaint, the board of directors for Enzo Biochem made decisions on behalf of Enzo Clinical Labs and Enzo Life Sciences.  Neither Enzo Clinical Labs nor Enzo Life Sciences had a president.  Instead, these entities' operations were directed by Enzo Biochem's management, including its CEO and Chair Elazar Rabbani.

18.      At times relevant to this Complaint, Kara Cannon was Enzo Biochem's Chief

---

[4] Enzo Biochem, Inc., Form 8K, Exhibit 2.1 at 12 (Mar. 16, 2023), https://ir.enzo.com/sec-filings/all-sec-filings/content/0001213900-23-020649/ea175132ex2-1_enzobio.htm.

Commercial Officer. However, she directed the day-to-day activities of both Enzo Clinical Labs and Enzo Life Sciences employees, including Member 2.

19.     Enzo Biochem and its subsidiaries shared corporate officers.  For example, Dieter Schapfel, M.D., served as the Chief Medical Director for Enzo Clinical Labs while being listed as an executive officer of Enzo Biochem in SEC filings.[5]

20.     Enzo Clinical Labs and Enzo Life Sciences conducted business out of adjacent offices. During the times relevant to this Complaint, Enzo Life Sciences employees routinely performed employment duties for Enzo Clinical Labs, and vice versa. Specifically, as Enzo Life Sciences' revenues continued to shrink, Elazar Rabbani increasingly directed Enzo Life Sciences employees to provide day-to-day services to Enzo Clinical Labs.

21.     Enzo Biochem dominated and controlled the activities of its subsidiaries, Enzo Clinical Labs and Enzo Life Sciences. Indeed, in SEC submissions Enzo Biochem described itself as "an integrated diagnostics, clinical lab, and life sciences company" and touted its "services for diagnostic testing" in such filings (i.e., the services offered by Enzo Clinical Labs).[6] Enzo Biochem specifically stated, for example, that "[w]e [Enzo Biochem] operate a regional clinical laboratory that offers extensive diagnostic services to New York, New Jersey and Connecticut medical communities."[7]

22.     Enzo Biochem treated the revenues of its subsidiaries as its own. For example, Enzo Biochem described in an SEC filing that "[f]or fiscal years ended July 31, 2020, 2019 and 2018, respectively, approximately 65%, 63% and 70% of the Company's revenues were derived

---

[5] Enzo Biochem, Inc., Form 10-K/A at 7 (Nov. 29, 2021), https://ir.enzo.com/sec-filings/all-sec-filings/content/0001213900-21-062399/f10k2021a1_enzobiochem.htm.
[6] Enzo Biochem, Inc., Form 10-K at 1 (Oct. 19, 2020), https://ir.enzo.com/sec-filings/all-sec-filings/content/0001213900-20-032066/f10k2020_enzobiocheminc.htm.
[7] *Id.* at 10.

from the Clinical Laboratory Services segment." Enzo Biochem also stated that "[a]s of July 31, 2020 and 2019, approximately 68% and 63% respectively, of the Company's net accounts receivable relates to its Clinical Laboratory Services business."[8]

23.     Enzo Biochem's domination and control of Enzo Clinical Labs and Enzo Life Sciences has resulted in fraud and wrongdoing against the United States and New York, as alleged below.

24.     Enzo Biochem knowingly directed and/or ratified the activities and operations of Enzo Clinical Labs and Enzo Life Sciences. Enzo Biochem had the power to prevent or correct regulatory violations which caused the presentation of false claims but failed to do so.

## IV.     STATUTORY AND REGULATORY BACKGROUND

### A.     Relator's Causes of Action

#### i.     Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*

25.     The federal False Claims Act, 31 U.S.C. § 3729 provides that any person who: (a) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (b) knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim; or (c) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the United States, is liable for a civil penalty per claim plus three times the amount of damages the United States sustained. 31 U.S.C. § 3729(a)-(b) & (g).

26.     The elements of a False Claims Act claim are: (1) a false or fraudulent claim or

---

[8] *Id.* at 11.

statement material to a false claim; (2) knowledge; and (3) materiality. *See United States v. LabQ Clinical Diagnostics, LLC*, 771 F. Supp. 3d 401, 433-37 (S.D.N.Y. 2025).

### ii.    New York False Claims Act, N.Y. State Fin. Law § 187, *et seq.*

27.    The New York False Claims Act provides that any person who: "(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval"; "(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "(h) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same; shall be liable to the state or a local government, as applicable, for a civil penalty . . . , plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person."  N.Y. State Fin. Law § 189(1)(a), (b), (h).

28.    Because the New York False Claims Act is "modeled on the federal FCA, courts regularly look to federal law when interpreting that law." *New York ex rel. TZAC, Inc. v. New Israel Fund*, 520 F. Supp. 3d 362, 374 (S.D.N.Y. 2021) (cleaned up).

### iii.    Federal and New York Anti-Kickback Statutes

29.    The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b prohibits any individual or entity from knowingly or willfully offering or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce a referral or recommendation for any item or service reimbursed in whole or in part under a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(2). It also prohibits the solicitation or receipt of any remuneration in return for a referral or recommendation for any item or service. 42 U.S.C. § 1320a-7b(b)(1). "Remuneration" under the AKS means anything of value. The scope of AKS is broad, as its aim is to protect the

integrity of federal health care programs from difficult-to-detect harms. A claim that includes items resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

30.    New York has similar antikickback provisions. *See* N.Y. Soc. Serv. Law § 366-d.

31.    The Eliminating Kickbacks in Recovery Act of 2018 ("EKRA"), 18 U.S.C. § 220, extends to clinical laboratories of all types. EKRA prohibits the waiver of co-payments and deductibles.  *See* 18 U.S.C. §§ 220(a), 220(e)(3)-24(b) (applying "with respect to services covered by a health care benefit program," and defining "health care benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual . . . .").

**B.    Regulatory Framework for Enzo's Laboratory Services**

**i.    The Medicare and Medicaid Programs**

32.    The Medicare program is a federal health insurance program that pays for covered medical care provided to eligible aged and disabled persons.  *See* 42 U.S.C. § 1395, *et seq.*

33.    Medicare is comprised of Parts A, B, C, and D. Part B is medical insurance that authorizes payment of federal funds for laboratory diagnostic services. *See* 42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

34.    Medicaid is a government health insurance program for the poor that is jointly funded by the federal and state governments. *See* 42 U.S.C. § 1396, *et seq.* Medicaid is administered by CMS at the federal level and by state agencies in each participating state at the state level. In the state of New York, the relevant state agency is the New York State Department of Health.

35.    A pillar of the Medicare/Medicaid program is medical necessity, meaning that no payment may be made for any expenses incurred for items or services that are not reasonable and

necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* 42 U.S.C. § 1395y(a)(1)(A). To ensure that laboratory tests are medically necessary, CMS imposes various requirements when a claim is submitted for reimbursement.

36.     To bill Medicare or Medicaid, a provider must submit an electronic or hard-copy claim form called a CMS-1500 form. When submitting the form, the provider must certify that the services in question were "medically indicated and necessary for the health of the patient."

37.     When submitting the CMS-1500 form, the provider must certify "this claim [] complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment, including but not limited to the Federal anti-kickback statute."

### ii.     Diagnosis Codes and Medical Necessity

38.     As is relevant to Scheme 1, alleged in detail below, codes associated with the International Classification of Disease, 9th and 10th Editions, Clinical Modification ("diagnosis codes") are used for the classification of disease and conditions, and to describe signs, symptoms, and medical circumstances.  These codes indicate the medical necessity of a particular test when a claim is submitted for reimbursement to government health care programs.   Without appropriate diagnosis codes, Current Procedural Terminology (CPT) codes reported for reimbursement will not be paid.

### iii.     Prohibition on Waiving or Limiting Patient Obligations

39.     As is relevant to Scheme 2, alleged in detail below, HHS-OIG has repeatedly indicated that a laboratory's reduction or waiver of patient obligations gives rise to illegal kickbacks.

40.     Patient obligations, *e.g.*, copayments and deductibles, are designed to make

patients conscious of their medical services expenses and discourage the ordering and performance of unnecessary medical services.  Copayments and deductibles act as embedded internal controls for payors.  There is no better mechanism to avoid unnecessary tests than requiring patients to pay a portion of the invoices for laboratory tests.  Although copayments and deductibles can be a financial burden to patients, service providers are required to make all necessary efforts to collect copayments from patients, with limited exceptions.[9]

41.     In 1994, HHS-OIG issued a Special Fraud Alert addressing the question "How Does the Anti-Kickback Statute Relate to Arrangement for the Provision of Clinical Lab Services?"  As an example of a situation giving rise to an inference of an illegal kickback, the Special Fraud Alert cited laboratories that waive patient copayments and deductibles.[10]

42.     The 1994 Special Fraud Alert warned that, when a "laboratory that does not have the managed care contract [] agree[s] to perform the managed care work free of charge," "the anti-kickback statute is implicated." When waiver of patient copayments and deductibles are "offered or accepted in return for the referral of Medicare or State health care plan business, both the laboratory and the physician may be violating the anti-kickback statute."[11]

43.     In 1998, HHS-OIG released further guidance stating: "[P]olicies should ensure that laboratories are not providing any inducements to gain a physician's business,[] including charging physicians a price below fair market value for their non-Federal health care program

---

[9] As courts have recognized: "The ban against waiving the copayment is simply the corollary of the rule that a [health care provider] must report his true fee to [the plan]; if a [health care provider] intends to waive the copayment, it is fraudulent for him to report to [the plan] that his fee includes the copayment." *Reynolds v. California Dental Service*, 200 Cal. App. 3d 590, 602 (1988).

[10] U.S. Dep't Health & Hum. Servs., Special Fraud Alert: Arrangements for the Provision of Clinical Lab Services (1994), https://oig.hhs.gov/documents/physicians-resources/980/121994.pdf [**Exhibit 3**].

[11] *Id.*

tests."[12] "Laboratories that charge physicians a price below fair market value to induce them to refer their Federal health care program business may be risking anti-kickback enforcement and false claims actions." *Id.*

44.    In 2000, HHS-OIG made clear that "disguising remuneration for Federal referrals through offers or payments of inflated amounts for non-Federal business or simply by offering or paying remuneration for non-Federal referrals to 'pull through' the Federal business" "may violate the [A]nti-[K]ickback [S]tatute."[13]  The same year, HHS-OIG issued a letter similarly indicating an anti-kickback "violation arises if the discount whatever its size is implicitly or explicitly tied to referrals of" government-funded business.[14]

45.    In 2008, HHS-OIG issued interpretations of its prior guidance reaffirming that "when a laboratory offers or gives an item or service for free or less than fair market value to a referral source, an inference arises that the item or service is offered to induce the referral of business."[15]

46.    In 2015, HHS-OIG found that when a laboratory provides free or below market services to certain privately-insured patients to secure all that physician's business, including Federal health care program business, then that practice implicates the AKS.[16]  Specifically, HHS-OIG found that even when a physician waived any financial benefits, such as bonuses for

---

[12] 63 Fed. Reg. 45080 (Aug. 24, 1998) (OIG Compliance Program Guidance for Clinical Laboratories) [**Exhibit 4**].

[13] U.S. Dep't of Health & Hum. Servs., Advisory Opinion No. 00-8: Spectrum Housing, d/b/a Housing Referrals of Maine at 5 (2000), https://oig.hhs.gov/documents/advisory-opinions/416/AO-00-08.pdf [**Exhibit 5**].

[14] U.S. Dep't of Health & Hum. Servs. (April 20, 2000), https://oig.hhs.gov/fraud/docs/safeharborregulations/amldiscount.htm [**Exhibit 6**].

[15] U.S. Dep't of Health & Hum. Servs., Advisory Opinion No. 08-06 at 5 (2008), https://oig.hhs.gov/documents/advisory-opinions/553/AO-08-06.pdf [**Exhibit 7**].

[16] U.S. Dept. of Health and Hum. Servs., Off. Inspector Gen., OIG Advisory Opinion No. 15-04 at 4–5 (2015), https://oig.hhs.gov/documents/advisory-opinions/693/AO-15-04.pdf [**Exhibit 1**].

overutilization or penalties for underutilization of the out-of-network laboratory's services (which HHS-OIG specifically identified as potential remuneration in its 1994 Special Fraud Alert), the AKS is implicated because remuneration includes not just direct financial payments, but also "reducing administrative and potential financial burdens associated with using multiple laboratories." *Id.* at 6. In other words, HHS-OIG reached this conclusion even though "physician practices would receive no [direct] financial benefit as a result of the [arrangement]." *Id.* at 5.

47.    Waiving insurance deductibles and co-payments is likewise illegal under New York Penal Law section 176.05.  Section 176.05(2) makes it a "fraudulent insurance act" for a person to present a written statement as a part of, or in support of, an application for a claim of payment pursuant to a public or private health insurance policy, which he or she knows to "contain materially false information concerning any material fact thereto; or [] conceal, for the purpose of misleading, information concerning any fact material thereto."  N.Y. Penal Law § 176.05.

48.    Section 515.2 of the New York Administrative Code similarly prohibits, *inter alia*, "offering or paying either directly or indirectly any payment (including any kickback, bribe, referral fee, rebate or discount), whether in cash or in kind, in return for referring a client to a person for any medical care, services or supplies for which payment is claimed under the program." N.Y. Comp. Codes R. & Regs. tit. 18, § 515.2(b)(5)(iii).

49.    It is well known in the industry that DOJ has filed lawsuits against several companies for waiving private-insurance patients' copayments and deductibles to induce Medicare/Medicaid patients' referrals, alleging that it is an insurance fraud and kickback scheme.

50.    Courts in multiple districts have found the practice to be unlawful.  In *United States of America ex rel. Chris Riedel v. Boston Heart Diagnostics Corporation*, federal Judge Reggie

B. Walton ruled that an allegation that a defendant laboratory waived patients' co-payments and deductibles, thereby providing a benefit to physicians, "sufficiently alleges how [a] purported waiver practice provided value to physicians; namely, by saving their time not spent on explaining copayment and deductible charges to patients and providing them an opportunity to market free laboratory testing." 332 F. Supp. 3d 48, 66 (D.D.C. 2018).

51.     In *United States v. Berkeley Heartlab, Inc.*, the court denied a motion to dismiss because the complaint "identifie[d] physicians and practices who were induced by BlueWave's promise of co-payment and deductible waivers to refer all of their patients to BlueWave's laboratory clients." 247 F. Supp. 3d 724, 731 (D.S.C. 2017).

52.     In *United States v. Crescendo Bioscience, Inc.*, the court reached the same conclusion regarding a similar claim. No. 16-CV-02043-TSH, 2020 WL 2614959, at *10 (N.D. Cal. May 23, 2020). The court denied the defendants' motion to dismiss, concluding that the relator stated a False Claims Act violation based on the alleged waivers of co-pays and deductibles. *Id.* The court readily presumed that physicians would be incentivized to refer patients based on the waiver of co-pays and deductibles. *Id.* The court explained that if a lab waives patients' fees, "allowing physicians to 'reassure their patients that they will not be responsible for more than $25,' *that is something of value to physicians* and they might be induced to send more patients to that lab . . . ." *Id.* (emphasis added).

53.     In *United States ex rel. STF, LLC v. Vibrant Am., LLC*, the relator alleged that the defendant "promises to cap patient deductible and/or copayments at $25 for physicians' privately insured patients which is attractive to physicians because it allows them to attract and retain patients by promising to perform all lab testing for no more than $25." No. 16-CV-02487-JCS, 2020 WL 4818706, at *1 (N.D. Cal. Aug. 19, 2020) (cleaned up). The court denied the

13

defendants' motion to dismiss, rejecting the argument that the alleged waivers were legal because they "relate[d] to privately insured patients." *Id.* at *15. The court determined that the relator's waiver claim was adequately pleaded.

### iv.   Laws and Regulations During the Covid-19 Public Health Emergency

54.   As is relevant to Scheme 3, on January 31, 2020, HHS announced a national public health emergency relating to COVID-19.[17]

55.   Between April 1, 2020, and December 31, 2020, CMS paid laboratories $100 per COVID-19 diagnostic test.[18]

56.   From January 1, 2021, to May 12, 2023,[19] CMS paid laboratories for Covid-19 testing in the following manner. For laboratories that take longer than two days from the time of collection to complete the COVID-19 test, Medicare paid $75 per test.[20] For laboratories that completed COVID-19 testing within two days of collection, Medicare paid $100 per test.[21]

57.   For Medicare to pay $100 for a Covid-19 test, laboratories like Enzo were required to satisfy two conditions: (1) turn around the particular test result within two calendar days of collection *and* (2) complete at least 51% of its Covid-19 tests for all patients within two calendar days in the previous calendar month.[22]

---

[17] U.S. Admin Strategic Preparedness & Response, *Determination That a Public Health Emergency Exists* (Jan. 31, 2020), https://aspr.hhs.gov/legal/PHE/Pages/2019-nCoV.aspx.
[18] U.S. Ctr. Medicare & Medicaid Srvs., *CMS Changes Medicare Payment to Support Faster COVID-19 Diagnostic Testing*, Oct. 15, 2020, https://www.cms.gov/newsroom/press-releases/cms-changes-medicare-payment-support-faster-covid-19-diagnostic-testing.
[19] Code U0005 was discontinued on or about May 12, 2023.
[20] U.S. Ctr. Medicare & Medicaid Srvs., *CMS Changes Medicare Payment to Support Faster COVID-19 Diagnostic Testing*, Oct. 15, 2020, https://www.cms.gov/newsroom/press-releases/cms-changes-medicare-payment-support-faster-covid-19-diagnostic-testing.
[21] *Id.*
[22] U.S. Ctr. Medicare & Medicaid Srvs., CMS Rulings (Jan. 1, 2021) at 6-7, https://www.cms.gov/files/document/cms-ruling-2020-1-r2.pdf [**Exhibit 2**].

58.    CMS provided the following example with respect to the second condition:

59.    For example, a laboratory is submitting a claim to Medicare for a [COVID-19 test] using HCPCS code U0003 with a line date of service of May 15, 2021. This laboratory would assess its performance based on [Covid-19 tests] completed during the calendar month (April 1, 2021 – April 30, 2021) that precedes the month identified by the CDLT [clinical diagnostic laboratory test] line date of service (May 2021). If the laboratory completed a total of 1000 of those CDLTs (including all such tests for non-Medicare patients) in April, and 490 of them had been completed within 2 calendar days of the specimen being collected, the laboratory would have a 49% test timeliness completion rate and may not bill for the $25 add-on payment as represented by HCPCS code U0005.[23]

## V.    ENZO KNOWINGLY VIOLATED THE FEDERAL AND NEW YORK FALSE CLAIMS ACTS

### A.    Enzo Used the Wrong Diagnosis Code to Ensure Reimbursement for Asymptomatic Covid-19 Surveillance Testing

60.    As detailed below, Enzo knowingly input a diagnostic code for asymptomatic Covid-19 surveillance tests that was inapplicable to the circumstances and designed to ensure unwarranted reimbursement.

61.    Enzo established a robust Covid-19 surveillance testing program for numerous Enzo clients, including schools, universities, and other sites requesting such testing.

62.    For example, in August 2020, State University of New York at Stony Brook announced an "on-site testing center in partnership with Enzo Clinical Labs. . . . as part of our ongoing surveillance plan during the semester."[24]

---

[23] *Id.*

[24] https://news.stonybrook.edu/university/stony-brook-university-aims-to-keep-students-safe-with-exclusive-covid-19-testing-center/

63.      In September 2020, State University of New York at Old Westbury announced that it was "launching a testing program as a means to survey the prevalence of COVID-19 in our campus community[,] . . . consistent with the recent SUNY policy requiring all campuses to conduct surveillance testing for COVID-19. . . .  Enzo Clinical Labs will analyze the collected samples with an expected turnaround of results in 1-3 days."[25]

64.      In September 2021, State University of New York at New Paltz announced that it "will require all vaccinated students, faculty and staff with a campus presence to be tested for COVID-19 every five weeks, beginning Sept. 7," as part of "mandatory, periodic surveillance testing."[26]  "The policy for unvaccinated students, faculty and staff remain[ed] the same: They must test once a week, every week they are on campus."

65.      In January 2022, State University of New York at New Paltz posted its "student surveillance testing schedule" and announced it was "continuing [its] partnership with ENZO Labs to offer this testing."[27]

66.      Enzo's surveillance testing programs for its clients, such as SUNY, did *not* include evaluating patients who received Covid-19 testing or documenting suspected exposure.

67.      With respect to coverage for surveillance testing, Official guidance issued by the Centers for Medicare and Medicaid Services indicate that asymptomatic screening is excluded from coverage.[28] Medicare guidance regarding Covid-19 testing stated that Medicare "*does not*

---

[25] https://oldwestburycatalyst.org/5306/news/new-covid-19-testing-program-to-begin-immediately/

[26] https://sites.newpaltz.edu/news/2021/09/fall-2021-mandatory-surveillance-testing-of-vaccinated-people/

[27] https://sites.newpaltz.edu/news/2022/01/vaccinated-student-surveillance-testing-schedule-for-spring-2022/

[28] U.S. Ctr. Medicare & Medicaid Srvs., *Medicare National Coverage Determinations Manual*, Rev. 11426 at 190.12 (May 20, 2022), https://www.cms.gov/regulations-and-

16

*cover non-diagnostic tests* (i.e., testing done for public health surveillance purposes).[29]

68.     In response to a question whether "plans and issuers [may] distinguish between COVID-19 diagnostic testing of asymptomatic people that must be covered, and testing for general workplace health and safety, for public health surveillance, or for other purposes not primarily intended for individualized diagnosis or treatment of COVID-19," CMS responded that "plans and issuers are *not required to provide coverage of testing such as for public health surveillance or employment purposes*."[30]

69.     Knowing that surveillance testing may not trigger payment from Medicare, Medicaid, HRSA, or other insurance payors, Enzo routinely billed the government using the wrong diagnosis code to ensure payment.

70.     For all surveillance testing patients, Enzo submitted claims for payment using ICD code Z03.818, which is applicable "where there is a concern about a possible exposure to COVID-19, but this is ruled out after evaluation."[31]

71.     Member 2 observed Hansen Lee, who was then Enzo's Director of Clinical

---

guidance/guidance/manuals/downloads/ncd103c1_part3.pdf
("Testing for asymptomatic bacteriuria as part of a prenatal evaluation may be medically appropriate but *is considered screening and therefore not covered by Medicare*.") (emphasis added).

[29] U.S. Ctr. Medicare & Medicaid Srvs., *MEDICARE PAYMENT FOR COVID-19 VIRAL TESTING: Skilled Nursing Facility/Nursing Facility*, https://www.cms.gov/files/document/covid-medicare-payment-covid-19-viral-testing-flow-chart.pdf (emphasis added).

[30] U.S. Ctr. Medicare & Medicaid Srvs., *FAQS ABOUT FAMILIES FIRST CORONAVIRUS RESPONSE ACT*, Feb. 26, 2026, https://www.cms.gov/files/document/faqs-part-44.pdf (emphasis added).

[31] U.S. Ctr. Medicare & Medicaid Srvs., ICD-10-CM Official Coding and Reporting Guidelines April 1, 2020 through September 30, 2020 [**Exhibit 8**] ("For cases where there is a concern about a possible exposure to COVID-19, but this is ruled out after evaluation, assign code Z03.818, Encounter for observation for suspected exposure to other biological agents ruled out.").

17

Operations,[32] directing Phlebotomy Manager, Elizabeth Newton and her staff to utilize ICD code Z03.818, regardless of a patient's circumstance. He repeated this policy frequently as a reminder to everyone working at the collection sites. In fact, Member 2 observed that the in-take screen on Enzo's computer at surveillance testing sites where she worked only listed one diagnosis code available to select.

72. The ICD code Z03.818—applicable only where a patient has had a "possible exposure to COVID-19 . . . ruled out after evaluation"—was clearly not appropriate for the thousands of surveillance tests Enzo administered at educational facilities and other surveillance sites without conducting an "evaluation." When a permitted medical provider inputs ICD code Z03.818, a Covid-19 test is considered medically necessary and is thus covered.

73. Enzo personnel were told to select this code to avoid any delay or denial with respect to a claim submission to the patient's insurance carrier to falsely justify medical necessity and to expedite reimbursement. When Member 2 questioned why Enzo used ICD code Z03.818, given that the testing performed at the universities and schools was exclusively for surveillance (not diagnostic) purposes, she was told to just follow direction and communicate the same to her group. Enzo selected code Z03.818 for all patients before sending the patients' samples for testing (*i.e.*, before any test result had been obtained).

74. The appropriate ICD code for asymptomatic surveillance testing was Z11.59, which states: "For asymptomatic individuals who are being screened for COVID-19 and have no known exposure to the virus, and the test results are either unknown or negative, assign code

---

[32] Although Lee directed Enzo Clinical Labs' clinical operations, he was principally an Enzo Life Sciences employee. *See* https://www.linkedin.com/in/hansen803/. This is yet another example that each Enzo entity is the alter ego of the other.

Z11.59."[33]

75.    If a permitted medical provider had input ICD code Z11.59, the Covid-19 test would not be considered medically necessary and thus would not be covered.

76.    Enzo's daily volume of Covid-19 specimens associated with its surveillance testing totaled in the thousands.  Enzo's large surveillance accounts include the following:

- SUNY Stony Brook – Stony Brook, New York

- SUNY New Paltz – New Paltz, New York

- SUNY Old Westbury – Old Westbury, New York

- Manhattan College – Riverdale, New York

- Bank Street School – New York, New York

- Spence School – New York, New York

- Cristo Rey New York High School – New York, New York

- The IDEAL School Manhattan – New York, New York

- Little Red School – New York, New York

- Manhattan College – Bronx, New York

- The Co-op School – Brooklyn, New York

- Resurrection Grammar School – Rye, New York

77.    Member 1, the former Corporate Vice President of Sales and Marketing at Enzo, estimates that the 2021 revenue from a few large State of New York University (SUNY) clients alone totaled more than $15 million.

78.    As a Field Service Manager, Member 2 had visibility into Enzo's practice to

---

[33] U.S. Ctr. Medicare & Medicaid Srvs., ICD-10-CM Official Coding and Reporting Guidelines April 1, 2020 through September 30, 2020 [**Exhibit 8**].

indiscriminately assign the inapplicable diagnosis code Z03.818 for patients undergoing surveillance testing. Relator Member 2 was aware that Enzo input this diagnosis code for the purpose of submitting claims to insurers in connection with its surveillance testing operations, including government funded payors. For example, SUNY participates in the New York State Health Insurance Program (NYSHIP), which receives government funding.

79.     Additional information about the details of the claims submitted in connection with the foregoing scheme is peculiarly within the knowledge of Enzo.

**B.     Enzo Waived Patient Obligations as a Kickback to Induce the Referral of Business**

80.     Enzo defrauded Medicare, Medicaid, and other government payors by routinely waiving or lowering patients' co-payments and/or deductibles, which were kickbacks to physicians who then referred substantial Medicare and other government business. Enzo thus presented to Medicare, and other government payors, claims for reimbursement of laboratory tests the referral of which was induced, in whole or in party, directly or indirectly, overtly or covertly, by the provision of kickbacks.

81.     In approximately 2020, Enzo did not have a contract with private insurer Emblem-GHI. As an out-of-network provider of laboratory services for Emblem-GHI patient beneficiaries, Enzo's services were not covered. *See* **Exhibit 9**.

82.     Beginning in approximately 2020, Relator Member 2 began receiving requests from Enzo sales representatives to "honor" certain patients' "in network benefits" by waiving the patient's copay down to $20. *See* **Exhibit 10**.

83.     The Enzo sales representatives requested a copayment reduction down to $20 because Enzo was an "out-of-network" laboratory for patients with Emblem-GHI, which had more than 3 million members in the New York metropolitan area. Enzo's management

recognized this as an impediment to securing continued business with physicians. Physicians wanted to use Enzo as their exclusive laboratory services provider, but if patients went to another physician for lower copayments and deductibles, then physicians would have no choice but to switch to another company for its laboratory services or risk losing patients.

84.    Accordingly, with respect to existing clients, Enzo salespeople asked Enzo management to reduce patients' payment obligation down to $20 to avoid entirely losing that physicians practice as an account entirely.

85.    Similarly, at the direction of Enzo's management, Enzo's salespeople seeking to secure new accounts represented to physician practices that Enzo would waive patient obligations down to $20 if the physician practice used Enzo's laboratory services.  This promise influenced numerous physician practices to work with Enzo, despite the large presence of patients with Emblem-GHI insurance.

86.    Knowing that this waiver scheme was illegal, Enzo's sales representatives, at the direction of Enzo's management, referred to the waivers using sanitized terminology, such as "treat[ing]" patients "as in network" even though the patients are "ghi out of network," or applying "adjustment[s]" and "[h]onoring [patients'] in network benefits."  *See* **Exhibit 10**.

87.    Enzo diligently implemented its waiver scheme, knowing that if it failed to do so the physicians would use the services of a different laboratory.  For example, on October 5, 2021, Karen Spriet forwarded a message from "Dr Grochowski" stating, in part: "I have two numbers on this patients [*sic*] invoice . . . For [$]280.70 . . . Why is patient being billed?" *See* **Exhibit 10**.

88.    Enzo's physician clients requested such waivers because the reduced patient out-of-pocket obligation is a substantial benefit to the physician practice.

89.    Waiving all but $20 of co-payments and deductibles is of great benefit to the

21

doctors, as, among other things, it keeps patients happy as they are not paying out of pocket. In exchange for this benefit, doctors utilize Enzo for their Medicare and Medicaid patients. Knowing that the waiver of co-payments and/or deductibles is a significant benefit that a physician can provide to his or her patients, Enzo promised physicians that Enzo will only seek to collect $20 deductible or co-payments, as long as the physicians send business—including Medicare business—to Enzo.

90.     Along similar lines, because Emblem-GHI's exclusive providers, both Quest Diagnostics and LabCorp, provided patients with one no-charge Pap test annually, Enzo matched this policy and provided free annual Pap tests for Emblem-GHI members. *See* **Exhibit 11**.

91.     Since doctors generally prefer to use only one lab, this illegal scheme allowed Enzo to capture substantial "pull-through" Medicare, Medicaid and other revenue that ENZO would not have obtained but for this scheme. Enzo clients referring Emblem-GHI patient specimens include the following:

- E & G Healthcare – Staten Island, New York

- Premier OB/GYN – Staten Island, New York

- Michael Benson, M.D. – Staten Island, New York

- Medical Practice Associates – Staten Island, New York

- OBG Associates – Staten Island, New York

- Dr. Borislav Kheyson, M.D. – Staten Island, New York

- Dr. Scarfuri & Associates – Staten Island, New York

- Alan Friedman, M.D. – Staten Island & Brooklyn, New York

- Ahava Medical – Brooklyn, New York

- Bella Donna Medical – Brooklyn, New York

22

- Valerie Wells, M.D. – Manhattan, New York

- Saul Stromer, M.D. – Manhattan, New York

- Sabina Grochowski, M.D. – Manhattan, New York

92.     Information about the claims submitted to Medicare, Medicaid, and HRSA as a result of waiving copayments and deductibles is peculiarly within the knowledge of Enzo.

93.     Emblem-GHI's Summary of Benefits and Coverage explains that patients will pay the most for an out-of-network provider.  *See* **Exhibit 9**. If Enzo did not honor the promised discounts, Enzo risked losing its business from its physician clients.

94.     Bill Wesnofske, Enzo's National Head of Strategic Markets, devised this scheme and tried to persuade Member 1 to implement this patient waiver policy with his sales team, but Member 1 refused, knowing the billing policy was illegal.  After Member 1's departure from Enzo, Mr. Wesnofske had conversations with members of Member 1's former sales team who had begun reporting to him, asking them to make the programming changes in the Enzo ordering systems.  They all refused.  *See* **Exhibit 12**.  The scheme was implemented despite these objections.

95.     Mr. Wesnofske stated that Enzo had created a billing mechanism that will avoid the balance bill problem with "little noise" from clients already on the program.  Also, he indicated to the sales group that this lenient billing policy should be shared with physicians and/or office staff to close new accounts.  Following these directions, Enzo's salespeople represented to physician practices that Enzo would implement this waiver policy if the physician practice chose to work with Enzo.

96.     This scheme is founded on the fact that physicians generally do not want to use multiple laboratories depending on the payor because, among other things, it creates more work

23

for their offices. Labs "hook" out-of-network physician clients by offering to waive or cap patient deductible and co-payments at $20. Although Enzo lost money on uncollected co-payments and deductibles, the higher out-of-network reimbursement and the profits it earned on the other referral business, including Medicare, Medicaid and HRSA more than made up the difference. While Enzo loses money on a given transaction by waiving patient co-pays and deductibles, the labs also generate tremendous revenue growth and profit from "pulling through" business from Medicare and other government insurers, including Medicaid and HRSA. In the year ended July 31, 2020, Medicare alone accounted for 23% of Enzo's revenue. *See* **Exhibit 13**. Member 1 estimates Medicaid accounted for approximately 5% of Enzo's revenue during the relevant time period.

97.     Enzo's message is clear: physicians can order any test they want, even medically unnecessary tests because patients will only have to pay a $20 co-pay or deductible. As a direct result of Enzo's waiver policy, Enzo's revenue grew significantly.

98.     The fact that Enzo agrees to accept a fraction of the amount it costs to perform the tests when it bills patients makes clear that its scheme is an inducement to obtain the referral of profitable Medicare and other insurance paid business. There is no economic rationale for agreeing to lose money other than to use the waivers as "loss leaders" and inducement for additional business.

99.     By partially waiving patient deductibles and co-payments, the physician is subject to diminished restraints on whether tests are medically necessary because their costs are substantially reduced for patients. Indeed, by minimizing the patient's financial stake in the transaction, Enzo neutralized one of the market's inherent checks on frivolous treatment—individual monetary responsibility for the cost of care. Enzo thus undermined these safeguards

24

by their routine waivers of patient deductibles and co-payments.  With only a $20 co-pay, there is a minimal financial barrier to physicians, which incentivizes ordering extra or expensive tests. Due to this scheme, insurers spend more than they otherwise would.

100.    Likewise, Enzo's "Loss-leader / Pull-through" kickback scheme is predicated, in part, upon circumventing the nearly universal control used by managed care insurers—that it will cost patients more to use an out-of-network provider.

101.    To summarize, Enzo's waiver practices provided substantial value to physicians by, among other things: (i) saving physicians and their staff time by eliminating the need to explain significant patient payment obligations; (ii) eliminating the administrative burden on physicians of deciding which lab to send patients to based upon their insurance; and (iii) lowering the risk that patients would seek out other practices based on concerns over fees associated with an out-of-network laboratory.

102.    Waiving co-payments and deductibles violates federal and state antikickback laws, including those set forth above.  As described, this routine waiver of deductibles and co-payments constitutes illegal remuneration, designed by Enzo to "pull through" higher-paying Medicare and other government business to Enzo.  Enzo violated the federal False Claims Act by charging Medicare for lab tests that were referred to Enzo by providers because of kickbacks offered to those providers by Enzo.  Accordingly, Enzo's practices were unlawful kickback schemes, strictly prohibited by Medicare statutes.

103.    Enzo's practices are independently unlawful as kickback schemes under New York's Medicaid regulations and constitute "fraudulent insurance act[s]" under New York Penal Law section 176.05, and accordingly give rise to violations under the New York False Claims Act.

104.    As alleged above, OIG guidance and courts in multiple districts have repeatedly found that waiving private insurance patients' copayments and deductibles to induce Medicare or Medicaid patients' referrals constitutes unlawful remuneration under the AKS. Thus, at all times relevant hereto, Enzo knew that federal law prohibited their giving and/or receiving these kickbacks. Instead, Enzo certified, explicitly and implicitly, that each claim they submitted to Medicare would fully comply with all statutes and regulations, including the anti-kickback provisions, and that as Medicare providers, they would comply with all pertinent statutes and regulations, including the anti-kickback provisions—which Enzo failed to do.

105.    Additional information about the details of the claims submitted to Medicare, Medicaid, and HRSA in connection with the foregoing scheme is peculiarly within the knowledge of Enzo.

### C.    Enzo Used the Code for Covid-19 Rapid Testing Even When Rapid Testing Was Not Performed

106.    Enzo routinely billed Medicare, Medicaid, HRSA and other government payors for expedited testing using CPT/HCPCS code U0005, even when Enzo did not satisfy either condition to legitimately seek reimbursement.

107.    As explained above, for Medicare to pay $100 for a COVID-19 test, laboratories like Enzo were required to satisfy two conditions: (1) turn around the particular test result within two calendar days of collection *and* (2) complete at least 51% of its Covid-19 tests for all patients within two calendar days in the previous calendar month.[34]

108.    In fall 2021, Bill Wesnofske, Enzo's National Head of Strategic Markets, told Member 3 that Enzo was engaging in "fraudulent billing" because Enzo regularly billed CPT

---

[34] U.S. Ctr. Medicare & Medicaid Srvs., CMS Rulings (Jan. 1, 2021) at 6-7, https://www.cms.gov/files/document/cms-ruling-2020-1-r2.pdf [**Exhibit 2**].

U0005 even though these Covid-19 test results were not reported within forty-eight hours of collection. In other words, Enzo routinely billed Medicare $100 per test when condition (1) was not satisfied: the turn-around time for that particular test result was *not* within two calendar days of collection.

109.    Member 2 confirmed that Enzo could not satisfy condition (2), as Enzo did not complete at least 51% of its COVID-19 tests for all patients within two calendar days of collection in the prior month.

110.    Enzo's COVID-19 testing volumes often exceeded testing capacity. The excess specimens were referred to partner laboratories for testing where turn-around-time could be anywhere from three to seven days, or more.

111.    Indeed, one of Enzo's primary reference laboratories, Baylor Genetics, was located in Houston, Texas.  Patient specimens took more than two days just to arrive at the Baylor lab facility in Texas after being received at Enzo labs in Farmingdale, New York.

112.    Despite not completing either condition within the requisite two-day time frame, Enzo nonetheless billed HCPCS U0005 to obtain additional payment for the tests.

113.    Additional information about the details of the claims submitted in connection with the foregoing scheme is peculiarly within the knowledge of Enzo.

## VI.    <u>CAUSES OF ACTION</u>

<u>FIRST CAUSE OF ACTION</u>
**On Behalf of the United States**
**Federal False Claims Act, Presenting False Claims**
**31 U.S.C. § 3729(a)(1)(A)**
**(Against All Defendants)**

114.    Relator incorporates by reference and realleges each and every allegation in paragraphs 1-113 of this Complaint.

115. Defendants knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval.

116. Specifically, as alleged in more detail above:

a. Enzo used an unwarranted diagnostic code, Z03.818, to trigger payments for Covid-19 surveillance tests;

b. Enzo waived private patient co-payment and deductible obligations as a kickback in order to "pull through" government payments;

c. Enzo used the code for Covid-19 rapid testing even when rapid testing was not performed.

117. The conduct of Enzo violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

118. Wherefore Relator prays for relief as set forth below.

**SECOND CAUSE OF ACTION**
**On Behalf of the United States**
**Federal False Claims Act, Making or Using False Records or Statements Material**
**to Payment or Approval of False Claims**
**31 U.S.C. § 3729(a)(1)(B)**
**(Against All Defendants)**

119. Relator incorporates by reference and realleges each and every allegation in paragraphs 1-113 of this Complaint.

120. Defendants knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim.

121. Specifically, as alleged in more detail above:

a. Enzo used an unwarranted diagnostic code, Z03.818, to trigger payments for Covid-19 surveillance tests;

b. Enzo waived private patient co-payment and deductible obligations as a

kickback in order to "pull through" government payments;

    c.    Enzo used the code for Covid-19 rapid testing even when rapid testing was not performed.

122.    The conduct of Enzo violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

123.    Wherefore Relator prays for relief as set forth below.

**THIRD CAUSE OF ACTION**
**(In the Alternative)**
**On Behalf of the United States**
**Retention of Proceeds to Which Not Entitled**
**31 U.S.C. § 3729(a)(1)(G)**
**(Against All Defendants)**

124.    Relator incorporates by reference and realleges each and every allegation in paragraphs 1-113 of this Complaint.

125.    In the alternative, Enzo knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

126.    Specifically, as alleged in more detail above:

    a.    Enzo used an unwarranted diagnostic code, Z03.818, to trigger payments for Covid-19 surveillance tests;

    b.    Enzo waived private patient co-payment and deductible obligations as a kickback in order to "pull through" government payments;

    c.    Enzo used the code for Covid-19 rapid testing even when rapid testing was not performed.

127.    Accordingly, Enzo received far more money from the Medicare, Medicaid, and

29

HRSA programs than it was entitled to.  Enzo knew that it received more money than it was entitled to, and avoided its obligation to return the excess money to the Government.

128.    The conduct of Enzo violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to  proof.

129.    Wherefore, Relator prays for relief as set forth below.

**FOURTH CAUSE OF ACTION**
**On Behalf of the State of New York**
**False Claims Act, Presenting False Claims**
**New York State Finance Law § 189(1)(a)**
**(Against All Defendants)**

130.    Relator incorporates by reference and realleges each and every allegation in paragraphs 1-113 of this Complaint.

131.    Enzo, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval under the New York Medicaid program, in violation of N.Y. State Finance Law § 189(1)(a).

132.    Specifically, as alleged in more detail above:

a.    Enzo used an unwarranted diagnostic code, Z03.818, to trigger payments for Covid-19 surveillance tests;

b.    Enzo waived private patient co-payment and deductible obligations as a kickback in order to "pull through" government payments;

c.    Enzo used the code for Covid-19 rapid testing even when rapid testing was not performed.

133. The conduct of Enzo violated New York State Finance Law § 189(1)(a) and was a substantial factor in causing the State of New York to sustain damages in an amount according to proof.

134. Wherefore, Relator prays for relief as set forth below.

## FIFTH CAUSE OF ACTION
### On Behalf of the State of New York
### False Claims Act, Making or Using False Records or Statements
### New York State Finance Law § 189(1)(b)
### (Against All Defendants)

135. Relator incorporates by reference and realleges each and every allegation in paragraphs 1-113 of this Complaint.

136. Enzo, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the State of New York, in violation of N.Y. Finance Law § 189(1)(b).

137. Specifically, as alleged in more detail above:

    a.    Enzo used an unwarranted diagnostic code, Z03.818, to trigger payments for Covid-19 surveillance tests;

    b.    Enzo waived private patient co-payment and deductible obligations as a kickback in order to "pull through" government payments;

    c.    Enzo used the code for Covid-19 rapid testing even when rapid testing was not performed.

138. The conduct of Enzo violated New York State Finance Law § 189(1)(b) and was a substantial factor in causing the State of New York to sustain damages in an amount according to proof.

31

139. Wherefore, Relator prays for relief as set forth below.

**SIXTH CAUSE OF ACTION**
**(In the Alternative)**
**On Behalf of the State of New York**
**False Claims Act, Retention of Proceeds to Which Not Entitled**
**New York State Finance Law § 189(1)(h)**
**(Against All Defendants)**

140. Relator incorporates by reference and realleges each and every allegation in paragraphs 1-113 of this Complaint.

141. Enzo, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the state or a local government, in violation of N.Y. Finance Law § 189(1)(h).

142. Specifically, as alleged in more detail above:

    a. Enzo used an unwarranted diagnostic code, Z03.818, to trigger payments for Covid-19 surveillance tests;

    b. Enzo waived private patient co-payment and deductible obligations as a kickback in order to "pull through" government payments;

    c. Enzo used the code for Covid-19 rapid testing even when rapid testing was not performed.

143. The conduct of Enzo violated New York State Finance Law § 189(1)(h) and was a substantial factor in causing the State of New York to sustain damages in an amount according to proof.

144. Wherefore, Relator prays for relief as set forth below.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by and through Relator, pray for judgment in their favor and against Defendants as follows:

1.    On the First through Third Causes of Action for damages as provided by 31 U.S.C. § 3729(a)(1)(A), (B), and (G), respectively, in the amount of:

      i.    Triple the amount of damages sustained by the United States;

      ii.    Civil penalties of up to the maximum allowable amount for each false claim and/or false statement;

      iii.    Recovery of costs, attorney's fees, and expenses;

      iv.    Pre- and post-judgment interest; and

      v.    Such other and further relief as the Court deems just and proper.

2.    On the Fourth through Sixth Causes of Action for damages as provided by New York State Finance Law § 189(1)(a), (b), and (h), in the amount of:

      i.    Triple the amount of damages sustained by the State of New York;

      ii.    Civil penalties of up to the maximum allowable amount for each false claim and/or false statement;

      iii.    Recovery of costs, attorney's fees, and expenses;

      iv.    Pre- and post-judgment interest; and

      v.    Such other and further relief as the Court deems just and proper.

3.    Further, as to the First through Sixth Causes of Action, Relator, on its own behalf, requests that it receive such maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the United States and/or the State of New York, plus an amount for its reasonable expenses incurred, plus reasonable attorney's fees and costs of this action.

33

Relator requests that its percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action. Relator also requests that it be awarded all costs of this action, including attorney's fees and expenses.

Respectfully Submitted,

Dated: March 6, 2026              **COTCHETT PITRE & MCCARTHY, LLP**


By: ___/s/ Grace Y. Park_____
NIALL P. McCARTHY (admitted *pro hac vice*)
GRACE Y. PARK (admitted *pro hac vice*)
ZACHARY N. ZAHAROFF
KEVIN J. BOUTIN (admitted *pro hac vice*)
**COTCHETT PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
nmccarthy@cpmlegal.com
gpark@cpmlegal.com
zzaharoff@cmplegal.com
kboutin@cpmlegal.com

34

## VIII.   <u>DEMAND FOR JURY TRIAL</u>

Relator Fraud Buster, LLC hereby demands a jury trial on all issues so triable.

Respectfully Submitted,

Dated: March 6, 2026          **COTCHETT PITRE & MCCARTHY, LLP**


By:      */s/ Grace Y. Park*             
NIALL P. McCARTHY (admitted *pro hac vice*)
GRACE Y. PARK (admitted *pro hac vice*)
ZACHARY N. ZAHAROFF
KEVIN J. BOUTIN (admitted *pro hac vice*)
**COTCHETT PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
nmccarthy@cpmlegal.com
gpark@cpmlegal.com
zzaharoff@cmplegal.com
kboutin@cpmlegal.com

35